CUAUHTÉMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ANTONIO VILLAAMIL (Bar No. 346321)
antonio_villaamil@fd.org
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
(213) 894-2854
(213) 894-0081 FAX

Attorneys for Defendant
RICHARD CHAMBERLIN

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RICHARD CHAMBERLIN. <br><br> Defendant. | Case No. 2:22-cr-00036-MWF <br><br> **DEFENDANT'S SENTENCING POSITION** |

Richard Chamberlin, through his attorney of record, Deputy Federal Public Defender Antonio Villaamil, hereby respectfully requests that the Court sentence him to one year and one day's incarceration.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 24, 2023        By  */s/ Antonio Villaamil*
                              ANTONIO VILLAAMIL
                              Deputy Federal Public Defender

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. OBJECTIONS TO THE PRESENTENCE REPORT ............................................. 2

    A.    Objection to the Application of U.S.S.G. §2A2.2, the Aggravated Assault Guideline .................................................................................. 2

    B.    Objection to the Application of the Obstruction of Justice Guideline to Count 4 ............................................................................................... 7

    C.    Objection to the Application of the Obstruction of Justice Guideline to Count 2 ............................................................................................... 9

III. THE APPROPRIATE SENTENCE ..................................................................... 10

    A.    Guidelines Calculation ................................................................................ 10

    B.    Nature and Circumstances of the Office and Mr. Chamberlin's History and Characteristics ...................................................................................... 10

IV. CONCLUSION ..................................................................................................... 17

## I. INTRODUCTION

Richard Chamberlin is a 53-year-old father of three, who in the throes of a deep depression, spurred on by the death of his mother during the height of self-isolation during the COVID-19 lockdown, and fueled by the abuse of alcohol and prescription medication, made a series of horrible decisions. He is deeply sorry.

Since his arrest in this case, Mr. Chamberlin has sought help to ensure that nothing like this would ever happen again. He threw away the OxyContin and drugs that clouded his judgment and instead began seeing a psychotherapist. Currently, Mr. Chamberlin meets weekly with two therapists. Since his 2021 arrest, Mr. Chamberlin has made great efforts to understand why he behaved in the way that he did, and how to prevent it from ever happening again.

All this hard work has been not only for himself, but for his children too. Mr. Chamberlin is still very much involved in the life of his three children, aged 20, 17, and 16 years old. He recognizes that his actions have and will continue to cost his family a great deal. He knows that only he is to blame, and he takes responsibility, but also, he wants to do the best he can to mitigate the harm he has done to them through his crimes.

Perhaps most importantly, however, Mr. Chamberlin's efforts to rehabilitate have also been for the victims of his crime. He recognizes that he has gravely frightened and disrupted the lives of several innocent people. He recognizes that, despite his views on abortion, his actions have no excuse. Mr. Chamberlin admits he acted completely out of line, and he apologizes. He is mortified and ashamed.

Mr. Chamberlin has agreed to pay the victims restitution in the amount of over $42,000 dollars, a significant sum for someone in his financial situation: he is indigent. Since this case began, Mr. Chamberlin has lost job opportunities, and a prolonged sentence of incarceration will only frustrate his future abilities, not only to provide for his family, but also to compensate the victims of his crime.

Mr. Chamberlin admits that punishment is necessary for his actions. A sentence of one year and one day in prison is sufficient punishment for his crimes, but not so drastic as to cause him to lose his home, his car, his livelihoods, and his ability to provide for his children and to pay the restitution owed to the victims. A prolonged sentence also runs the risk of significantly derailing his rehabilitation. Accordingly, Mr. Chamberlin respectfully requests that this court imposed a sentence of one year and one day.

## II. OBJECTIONS TO THE PRESENTENCE REPORT

### A. Objection to the Application of U.S.S.G. §2A2.2, the Aggravated Assault Guideline

Here, the presentence report wrongly characterizes Count 2's underlying offense as an "aggravated assault," and therefore incorrectly applies the felony guideline U.S.S.G. §2A2.2, Aggravated assault, to a misdemeanor offense of conviction. The result exorbitantly, and disproportionately, inflates Mr. Chamberlin's offense level. However, Mr. Chamberlin never specifically intended to cause body injury. Instead, and for the reasons explained below, U.S.S.G. §2H1.1(a)(3) applies, fixing the offense level for Count 2 at 10.

To begin, the burden is on the government to prove the facts necessary to establish the base offense level. *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990) ("Since the government is initially invoking the court's power to incarcerate a person, it should bear the burden of proving the facts necessary to establish the base offense level.).

Appendix A of the United States Sentencing Guidelines points to the application of U.S.S.G. §2H1.1, Offenses Involving Individual Rights, in the case of a violation of 18 U.S.C. § 248(a). U.S.S.G. §2H1.1(a) instructs to apply the greatest of four possible base offense levels:

(1) the offense level from the offense guideline applicable to any underlying offense;

(2) 12, if the offense involved two or more participants;

(3) 10, if the offense involved (A) the use or threat of force against a person; or (B) property damage or the threat of property damage; or

(4) 6, otherwise.

§2H1.1(a).

Accordingly, the first step in this analysis, under U.S.S.G. §2H1.1(a)(1), is to determine Count 2's underlying offense. Application Note 1 clarifies, "'Offense guideline applicable to any underlying offense' means the offense guideline applicable to any conduct established *by the offense of conviction* that constitutes an offense under federal, state, or local law . . . ." U.S.S.G. §2H1.1(a) App. Note 1 (emphasis added). Thus, the relevant conduct for inquiry stems from the admitted violation of 18 U.S.C. § 248(a).

The Aggravated assault guideline, U.S.S.G. §2A2.2, defines "Aggravated assault" in Application Note 1: "'Aggravated assault' means a *felonious* assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." U.S.S.G. §2A2.2, App. Note 1 (emphasis added).

Notably, the "offense of conviction" here is a misdemeanor offense, not a "felonious assault" as contemplated in §2A2.2, Application Note 1. Indeed, the application of this guideline, a felony guideline, to the misdemeanor offense causes a highly unusual result in the presentence report's guidelines calculation; the misdemeanor offense results in significantly higher guidelines than the felony offense. The misapplication of the felony, aggravated assault guideline exorbitantly inflates Mr. Chamberlin's resulting offense level. Despite 18 U.S.C. § 248(a)'s statutory maximum

3

sentence of 12 months, after application of all the specific offense characteristics the presentence report claims apply, the report arrives at an alarmingly high offense level of 23, which recommends a sentence of 46-57 months' imprisonment at the lowest criminal history category. The resulting recommendation would be shockingly roughly four to five times the statutory cap of 12 months. The absurd result alone demonstrates the error.

Further, this case clearly does not involve "serious bodily injury," "strangling, suffocation, or attempting to strangle or suffocate," nor is there any demonstrated "intent to commit another felony" as contemplated in U.S.S.G. §2A2.2, App. Note 1.

Admittedly, however, this case does involve the use of a "dangerous weapon," Mr. Chamberlin's BB gun. However, there is no evidence, nor admission, that Mr. Chamberlin acted with the specific intent "to cause bodily injury (i.e., not merely to frighten) with that weapon" as would be required to prove assault with a dangerous weapon. *See* U.S.S.G. §2A2.2, Application Note 1. Specific intent to do bodily harm is an element of the offense of assault with a dangerous weapon. *United States v. Smith*, 520 F.3d 1097, 1101 (9th Cir. 2008) (citing *United States v. Etsitty*, 130 F.3d 420, 427 (9th Cir.1997)). Instead, Mr. Chamberlin clearly fired his BB gun "merely to frighten," U.S.S.G. §2A2.2, Application Note 1, rather than to cause physical, bodily injury, as evidenced by his admission that he "intentionally intimidated and interfered with, and attempted to intimidate, and interfere with, the clinic and its doctors, staff, and patients." Plea Agreement, Dkt. 37, at pg. 12 ln. 10-12.

Mr. Chamberlin accepted responsibility and pleaded guilty to Count 2 of the Indictment, charging a misdemeanor violation of 18 U.S.C. § 248(a). Specifically, by the plea agreement, Mr. Chamberlin admitted to intentionally intimidating and interfering with the Planned Parenthood by firing a BB gun at the clinic, including at its front door and windows, causing damage to the clinic, including breaking windows. He admitted that he did so in order to intimidate and to interfere with the clinic and the services it provides. But Mr. Chamberlin never admitted to aiming at any person,

4

whether staff or patient. There is no indication in the plea agreement or otherwise that Mr. Chamberlin was aware of any person being present or in the line of fire of his BB gun, nor that he otherwise acted with the intent to place anyone in imminent threat of harm. He never intended to physically hurt anyone. Instead, at its core, this offense clearly involves the destruction of clinic property, not a direct attempt to cause injury to any person. He clearly intended to frighten, intimidate, and interfere, as written in the plea agreement, but he did **not** specifically intend to cause bodily injury.

In the Presentence Report, U.S.P.O. Avelar reasons that Mr. Chamberlin intended to do bodily harm because "he aimed his weapon at the doors and windows of the facility where individuals would most likely be present. The majority of the attacks also occurred during business hours when the facility would have been open and receiving patients through the front door where Chamberlin was aiming." PSR ¶ 41. Glaringly missing from USPO Avelar's analysis, however, is any indication that Mr. Chamberlin intentionally aimed the BB gun at any person at all. There is no evidence that Mr. Chamberlin, who was driving by the clinic in a moving car during each of the offenses, could see any person behind a window or behind a banner.

Concededly, Mr. Chamberlin's behavior was reckless, and he acted with a reckless disregard as to whether he might cause bodily harm—however that is not enough to sustain a finding of aggravated assault with a dangerous weapon. *See Smith*, 520 F.3d at 1101 (specific intent to do bodily harm is an element of assault with a dangerous weapon). There is no evidence, nor admission, that he specifically intended to strike a person with a BB pellet and thus cause them bodily injury, and therefore, the offense does not rise to the level of an aggravated assault.

Instead, the "underlying offense" guideline which corresponds most closely to the misdemeanor offense conduct here, firing a BB gun at the clinic with the purpose of intimidating its staff and patients, is more appropriately covered by either the

misdemeanor assault guideline, U.S.S.G. §2A2.3, Assault,[1] or the catch-all misdemeanor guideline, U.S.G. §2X5.2, which covers Class A Misdemeanors not covered by another specific offense guideline. The Court need not determine which of the two misdemeanor guidelines apply to this case, because, either way, the resulting offense level would be less than 10 under U.S.S.G. §2H1.1(a)(3), which undoubtedly applies here.[2]

Next, we must consider U.S.S.G. §2H1.1(a)(2), whether the offense "involved two or more participants." Though there is evidence that someone was in the car with Mr. Chamberlin on two of these occasions, see PSR ¶ 34, there is no conclusive proof of who that person was, nor what role, if any they played in the offense conduct. Therefore, the government fails to meet its burden to put forth sufficient evidence to determine that U.S.S.G. §2H1.1(a)(2) applies. See Howard, 894 F.2d at 1090.

However, U.S.S.G. §2H1.1(a)(3) applies where "(A) the use or threat of force against a person; or (B) property damage or the threat of property damage." §2H1.1(a)(3). Here, there is ample evidence of property damage as a result of Mr. Chamberlin's BB pellets striking the clinic. Accordingly, under U.S.S.G. §2H1.1(a)(3), the base offense level for Count 2 is 10, as the highest of the applicable base offense levels under U.S.S.G. §2H1.1(a).

Finally, the 3-level Hate Crime Motivation or Vulnerable Victim enhancement under U.S.S.G. §3A1.1 does not apply. Mr. Chamberlin concededly targeted the clinic due to his anti-abortion views. He targeted the entirety of the clinic, its doctors, staff, and patients—not exclusively women seeking abortions. Mr. Chamberlin did not act

---

[1] Though, due to Mr. Chamberlin's lack of intent to cause bodily injury, the defense does not concede that the offense conduct is appropriately characterized as an assault,

[2] Under U.S.S.G. §2A2.3(a), Assault, the base offense level would be 7 due to the use of a dangerous weapon. No specific offense characteristics apply. Under U.S.S.G. §2X5.2, the offense level would be 6. As noted below, neither of these guidelines control here because they are less than 10, the greater and applicable base offense level under U.S.S.G. §2H1.1(a)(3).

6

out of hatred of women per se—though he admits his actions are indefensible, his motivation is most accurately characterized as opposing the practice of abortion, rather than hatred of women. Accordingly, U.S.S.G. §3A1.1 does not apply.

**B.      Objection to the Application of the Obstruction of Justice Guideline to Count 4**

After his May 7, 2021 arrest, but before being charged federally, Mr. Chamberlin relinquished possession of eight firearms, giving them to his neighbor, to comply with an order in a related restraining order proceeding. He did not do so with the purpose of concealing their existence from law enforcement. Therefore, the two-level increase under U.S.S.G. § 3C1.1 is not warranted.

U.S.S.G. § 3C1.1 provides for a two level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction. . . ." U.S.S.G. § 3C1.1. The burden to prove the enhancement falls on the government. *Howard*, 894 F.2d at 1090.

As acknowledged in the presentence report, after his May 7, 2021, arrest by local police, Mr. Chamberlin also became involved in a series of restraining order lawsuits—lawyers for Planned Parenthood requested approximately six stay-away orders on behalf of the staff of the clinic. *See* PSR ¶ 30. As part of that litigation, the court ordered that Mr. Chamberlin not be allowed to possess firearms.

As this Court is aware, and Mr. Chamberlin admits, notwithstanding his Arizona felony conviction, Mr. Chamberlin owned, possessed, and had registered in his name several firearms. And so, to comply with the terms of the court's order, and after consulting with counsel, Mr. Chamberlin began the process of either relinquishing ownership or possession of those remaining firearms. For example, as noted in the presentence report and Exhibit A of the Plea Agreement, Mr. Chamberlin relinquished possession and ownership of four of those firearms by selling them, lawfully. *See* PSR

¶ 30; Plea Agreement, Exhibit A. He also attempted to comply with the order by relinquishing possession of the remaining firearms to a neighbor.

Furthermore, when Mr. Chamberlin told his neighbor the charge was dropped, PSR ¶ 30, he believed he was telling the truth. Mr. Chamberlin was originally arrested and booked by local police on May 7, 2021. Immediately following his arrest, during questioning, Mr. Chamberlin volunteered to police officers that he had previously been convicted of a felony; however, on May 7, 2021, those officers could not find any record of that conviction. Exhibit E, Pasadena Police Paperwork, at Bates USAO_002044 ("I asked Chamberlin if he had been convicted of a felony and he told me he had. I later conducted a records check and was unable to locate any previous convictions."). Despite this apparent oversight, police officers "arrested" him on several charges, including the local, California equivalent of felon in possession of a firearm. Ex. E at Bates USAO_002047 ("I placed Chamberlin under arrest for . . . PC 29800(a)(1) Possession of a Firearm by a Prohibited Person . . . ."). However, when he was charged by complaint in the local courts shortly thereafter, he was not formally accused of being a felon in possession of a firearm under California law. Exhibit F, Pasadena Criminal Complaint. Thus, at the time Mr. Chamberlin made the comment to his neighbor, and from his layman's perspective, he understood the charge had been "dropped." Mr. Chamberlin did not have his initial appearance on the felon in possession of a firearm count in the Central District of California until January 28, 2022. Min. of Init'l App.; Dkt. 7.

Additionally, those firearms were registered in his name. *See* PSR ¶ 51. Mr. Chamberlin knew very well that their existence could be discovered, and his ownership of them verified, by a simple law enforcement records search. If he was trying to hide them, this was certainly a very ineffective way of doing that. But he was not trying to hide them, he was only trying to comply with the order that he not possess them.

Furthermore, Mr. "Chamberlin *admitted* to giving a neighbor eight of his firearms." PSR ¶ 30 (emphasis added). He did not try to hide this fact from law enforcement. He openly admitted it.

Mr. Chamberlin was not trying to do anything wrong by relinquishing the firearms in this way. He transferred the firearms to comply with the restraining order court's directive, not to obstruct the investigation. Therefore, the two-level increase under U.S.S.G. § 3C1.1 does not apply.

### C. Objection to the Application of the Obstruction of Justice Guideline to Count 2

Even if this Court disagrees with the analysis in Section B, above, objecting to the presentence report's application of the Obstruction of Justice guideline to Count 4, that guideline still does not apply to Count 2. The presentence report increases the offense level for Count 2 by two citing an adjustment for obstruction of justice, resulting in improper double counting. *See* PSR ¶¶ 45-46.  However, because any obstruction here necessarily related to the firearms offense charged in Count 4, and not the FACE Act charge from Count 2, this second application of a two-level increase under U.S.S.G. §3C1.1 is in error.

U.S.S.G. §3C1.1 applies where both "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, *and* (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . ." U.S.S.G. §3C1.1 (emphasis added).

The most inculpatory interpretation of the conduct at issue here is that Mr. Chamberlin intended to conceal the eight firearms, registered in his name, from law enforcement by giving them to a neighbor. There is no allegation nor any evidence that any of the firearms at issue were used or possessed to further or in connection with the offenses involving Planned Parenthood. Therefore, any obstruction that occurred here

9

was related only to Count 4, the firearms offense, and not Count 2, the Planned Parenthood offense. The Court should not apply a two-level increase under U.S.S.G. §3C1.1 to Count 2.

## III. THE APPROPRIATE SENTENCE

### A. Guidelines Calculation

As elaborated above, Mr. Chamberlin disputes the probation officer's guidelines calculation. On Count 2, his base offense level is 10 under U.S.S.G. § 2H1.1(a)(3). On Count 4, his base offense level is 14 under U.S.S.G. § 2K2.1(a)(1), with a four-level enhancement for possessing between 8 and 24 firearms—the obstruction of justice enhancement does not apply—for a total of 18.

Under U.S.S.G. § 3D1.4(a), Count 4 is assigned one Unit. Under U.S.S.G. § 3D1.4(b), Count 2, which is 8 levels below Count 4, is assigned one-half Unit. Accordingly, the higher of the two offense levels is increased by one level under U.S.S.G. § 3D1.4(a). For a total of 19.

There is a three-level reduction for accepting responsibility under U.S.S.G. § 3E1.1(a). His total offense level is therefore 16. He agrees that his criminal history category is I. His guidelines range is therefore 21 to 27 months' imprisonment. However, for the reasons set forth in detail below, a sentence of one year and one day's incarceration is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

### B. Nature and Circumstances of the Office and Mr. Chamberlin's History and Characteristics

In determining the appropriate sentence for a defendant, a sentencing court must "make an individualized assessment based on the facts presented," which includes "a broad command to consider the nature and circumstances of the offense and the history

10

and characteristics of the defendant." *Gall v. United States*, 552 U.S. 38, 50 & n.6 (2007) (quotation marks omitted); 18 U.S.C. § 3553(a).

### *Mr. Chamberlin's life circumstances surrounding the Pasadena Planned Parenthood incidents.*

On Mother's Day 2020, immediately preceding the first time he fired his BB gun at the Pasadena Planned Parenthood, Mr. Chamberlin's mother passed away from a cancerous brain tumor. Mr. Chamberlin was prevented from seeing her or saying goodbye in part due to restrictions related to coronavirus pandemic. Shortly before that, Mr. Chamberlin's stepfather also passed away. Mr. Chamberlin was devastated. He was hurled into a major depression that he did not begin to understand how to deal with.

At the time, Mr. Chamberlin was traveling regularly to Mexico to work on an independent film he was producing. While there, he became connected with a doctor, who prescribed Mr. Chamberlin a cocktail of drugs to help him manage not only his severe grief, but also to treat chronic pain related to injuries he suffered while working for years as a stuntman. At the direction of this doctor, Mr. Chamberlin began taking a cocktail of Prozac, Lexapro, Xanax, and OxyContin. The drugs did not make Mr. Chamberlin feel any better, instead they only made his depression deepen. To make matters worse, he supplemented this mixture with edible marijuana and vodka. He writes, "Looking back at that time, I can see that those drugs did not help my depression at all, but made me spiral deeper into it. I turned to alcohol to cope and the combination was only worse." Exhibit A, Chamberlin letter. The results were catastrophic.

Mr. Chamberlin remembers that this combination made him feel "like a zombie an auto pilot." Ex. A. Mr. Chamberlin's oldest daughter, Isabella Chamberlin, recounts in her sentencing video,

> It went from as if he was being there to not even like hearing us talking to him . . . . Like I said, me and my dad like to do fun things . . . he just wasn't

> there for that. He was there but his mind wasn't there. He was just off in the distance—all the time.

Exhibit H, Sentencing Video.[3] Erika Urbina, the mother of Mr. Chamberlin's children, states of that time,

> I had known for some time after his mom passed away, he was not doing well emotionally. He seemed distant and emotionally dull, not the same spark in his eyes. He was not the same person I always knew [sic] and I was worried for him."

Exhibit B – Urbina Letter.

While in this state, Mr. Chamberlin's severe depression was sometimes channeled into misplaced anger. Roughly twenty years prior, when Mr. Chamberlin was about 23 years old, he learned that his then-girlfriend had had an abortion of their unborn child. Of the experience, he writes, "I felt, and still feel, the loss of my unborn child very powerfully." Ex. A. Mr. Chamberlin believes that the abortion occurred at the same Planned Parenthood from this case. "Every time I drove by it, a part of me felt like, 'You took my child.' Losing that child was something I've never gotten over and I'll never get over," he states in the attached video. Ex. H, forthcoming. In his impaired state, Mr. Chamberlin inappropriately lashed out at the clinic, by firing his BB gun at the building on multiple occasions, as he drove by. He deeply regrets this decision apologizes to everyone he hurt.

The offense conduct has been an aberration in Mr. Chamberlin's otherwise peaceful life. Multiple people from his community have come forward to attest to their shock at the charges. His longtime business partner John Rogers states in the forthcoming video:

> It seems very out of character for him. Rich doesn't seem to have that kind of nature within him. Like I said, he's always--he's so family orientated

---

[3] Exhibit H, Sentencing Video, forthcoming, will be filed shortly.

that it's not--to me, when I first heard about the situation, it just didn't seem like wow that's real, and-- Because I would have never suspected anything of that nature coming from him at all.

Ex. H, forthcoming. Maya Hewitt, his girlfriend at the time writes, "[H]is offense was extremely unexpected and shocking." Exhibit C, Hewitt Letter. Erika Urbina agrees, "When I was informed of the felony Richard had committed in regards to reproductive health, I honestly could not believe it. He had always been a person that believed helping and protecting others." Ex. B.

Instead, his community agrees is that Mr. Chamberlin is a supportive, family man, and a pillar of his community. Erika Urbina writes:

> All the qualities Richard had I cherished in a man. . . . He would constantly kiss, hug and play with [our children]. He even took over as a stay-at-home dad when my job got too demanding. He would cook vegetarian/vegan style so the kids would stay as healthy as possible. Till this day he is still very involved in their everyday lives and tries to keep them learning new things. He helped all three learn how to drive. He searched for a car for our middle child. He employs our oldest and youngest children when he finds a filming job. He tries to keep them up to date on what's going on in the world so they can stay safe. He has managed to live close to my house so he could drop by anytime he wants to spend time with them.

Ex. B.

***Mr. Chamberlin's genuine remorse, commitment to rehabilitation, and promise to pay the victims restitution.***

Mr. Chamberlin, through his plea, and through his letter to the Court, Exhibit A, expressed genuine, heartfelt remorse for the offense conduct. He has expressed a genuine desire to move forward and rehabilitate, for himself, for his family, and for the victims of his crimes.

13

Notwithstanding his mental state at the time, Mr. Chamberlin admits full responsibility for his actions. In his sentencing video he states, "I'm still accountable. I was the one who was putting the pills in my mouth and swallowing." Ex. H, forthcoming. He writes,

> I admit responsibility one hundred percent but sometimes I feel like it was a different person who fired that BB gun at the Planned Parenthood. What I did was beyond stupid. It was the biggest mistake of my life. I didn't mean to hurt anyone. And yet now I see that of course I hurt so many people. I'm so ashamed and I'm so sorry.

Ex. A. He states, "I believe in accountability, and I know that I deserve punishment." Ex. A. Mr. Chamberlin continues:

> My arrest in May 2021 was a sobering moment for me. It was a wake up call. I threw away all the pills I was taking. I stopped the drinking. I began seeing a therapist again. Right now, I'm seeing two therapists a week. I am not the person I was when I did those things to the Planned Parenthood clinic. Those are not my values. That is not who I am. I am a peaceful man. I want to make sure I never act like that again, and I promise to the Court and to the victims and to my family that I won't.

Ex. A. Mr. Chamberlin is committed to his rehabilitation, continuing his therapy, and abstinence from drugs and alcohol, to ensure he is never again a danger to anyone.

Mr. Chamberlin has expressed a genuine desire to do what he can to compensate the victims in this case. He has agreed to pay the victims restitution in the amount of over $42,000 for the damages his actions have cost them.

> I want to do the best that I can to make it right with the victims. I know that I cannot undo the fear that I caused them. I know I can't unbreak the property that I broke. I hope that by pleading guilty and by paying the restitution in this case, I can begin to make things better for them.

Ex. A. He recognizes that nothing he can do can fully undo the harm he caused, but he sincerely wants to make every effort he can to try.

### *The nature and circumstances of the felon in possession of a firearm charge.*

Mr. Chamberlin has been convicted of being a felon in possession of a firearm by his own admission. Despite his 2012 felony conviction in Arizona, Mr. Chamberlin owned and possessed several firearms, registered in his name. *See* PSR ¶ 51. He explains:

> I also admit my terrible mistake of keeping so many of my firearms after I was convicted of a felony in Arizona in 2012. I know that I was convicted of a felony, and I know that I should have gotten rid of those guns long ago. I had never been in a serious court proceeding like that before. I was supposed to have that conviction expunged, but with the passing of time, that just didn't happen. I thought my lawyer in Arizona was handling it, but I later learned that he did not. I know that it's my responsibility, and nobody else's, to make sure I am following the law, especially when it comes to guns. I cut corners and I will pay the price for that. I see now that I should have reached out to someone for advice. I should have handled this very differently. I regret it all, and I apologize to the Court for violating the law.

Ex. A. Mr. Chamberlin makes no excuses. He recognizes that it was impingent on him--and him alone--to make sure he in compliance with the law. Though he hoped and expected that his lawyer in Arizona would be filing for expungement under A.R.S. § 13-911 after Mr. Chamberlin completed his sentence of probation in that case, the conviction remains. Accordingly he takes full responsibility for not taking the appropriate actions, in a timely manner, and for not relinquishing ownership over the his registered firearms as he was required to do.

***Deterrence, just punishment, and the need to avoid unwarranted sentence disparities***. In addition to the factors already discussed, this Court must consider any additional factors that will impact the reasonableness of a sentence under § 3553. "Imprisonment is not an appropriate means of promoting correction and rehabilitation," 18 U.S.C. § 3582(a), and a sentence should be "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a). Mr. Chamberlin is deeply committed towards his rehabilitation, and he knows that through his therapy he can continue to live a productive, respectful life, and provide for his children. Mr. Chamberlin has the strong support of his family, and they also rely on him as a provider. Mr. Chamberlin has never served any time in prison, and at his age, and particularly with the corresponding responsibilities he has as a father, a prolonged term of incarceration would be especially onerous.

Mr. Chamberlin understands that punishment is necessary for his conduct, but he respectfully requests that he be given an opportunity to prove to this Court and the victims and his family that he can once again be a valuable member of society. To provide for himself and his children, Mr. Chamberlin works several freelance jobs, for example taking photos and videos of cars for used car dealerships. These jobs are dependent on his personal relations with his clients. A prolonged absence will decimate these businesses and make it extremely difficult for him to both provide for his family and pay the victims the promised restitution amount once he is released. This is especially true in Mr. Chamberlin's primary industry, audio/visual production, where technology is constantly moving and evolving. At 53 years-old, if Mr. Chamberlin is incarcerated for a prolonged period, he may effectively age out of the industry. Taking this into account, a sentence of one year and one day's incarceration is just punishment for this offense and sufficient, but not greater than necessary.

Finally, such a sentence would avoid unwarranted sentencing disparities. As demonstrated by the United States Sentencing Commission Interactive Data Analyzer[4], for defendants in the Central District of California in Fiscal Year 2021, when filtered for defendants convicted of firearm crimes, primary guideline § 2K2.1, and criminal history category I, 100% of defendants received a sentence of 24 months or below. Exhibit G, charts produced from the Interactive Data Analyzer. As a result, a sentence of one year and one day's incarceration would be well within the heartland of sentences received by defendants similarly situated to Mr. Chamberlin.

## IV.  CONCLUSION

Mr. Chamberlin acknowledges that he made a series of serious and harmful mistakes. He acknowledges that he deserves punishment. Accordingly, and based on the foregoing, the defense requests that this Court sentence Mr. Chamberlin to one year and one day's incarceration.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: April 24, 2023         By  /s/ *Antonio Villaamil*
                                  ANTONIO VILLAAMIL
                                  Deputy Federal Public Defender

---

[4] Located at https://ida.ussc.gov/analytics/saw.dll?Dashboard

17