E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
FRANCES S. LEWIS (Cal. Bar No. 291055)
Assistant United States Attorney
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4850
    Facsimile: (213) 894-2979
    E-mail:    frances.lewis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-CR-36-MWF |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT RICHARD ROYDEN CHAMBERLIN |
| v. | |
| RICHARD ROYDEN CHAMBERLIN, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Frances S. Lewis, hereby files its sentencing position for defendant RICHARD ROYDEN CHAMBERLIN.

This sentencing position is based upon the attached memorandum of points and authorities, the Presentence Investigation Report dated February 13, 2023 (dkt. 45), recommendation letter of the Probation Officer (dkt. 44), the attached declaration of AUSA Frances S. Lewis and exhibits thereto, including victim impact statements, any additional statements by victims who appear at the sentencing hearing

in this case, the files and records in this case, and such further

evidence and argument as the Court may permit.

 Dated: April 24, 2023              Respectfully submitted,

                                    E. MARTIN ESTRADA
                                    United States Attorney

                                    MACK E. JENKINS
                                    Assistant United States Attorney
                                    Chief, Criminal Division


                                    _____/s/_____
                                    FRANCES S. LEWIS
                                    Assistant United States Attorney

                                    Attorneys for Applicant
                                    UNITED STATES OF AMERICA

ii

# **Table of Contents**

I.   INTRODUCTION...................................................1

II.  FACTUAL BACKGROUND............................................2

   A.   Background on Planned Parenthood..........................2

   B.   Defendant's Attacks on Planned Parenthood.................3

      1.   Defendant's BB Gun Attacks against Planned
           Parenthood Began in June 2020.........................3

      2.   Defendant's BB Gun Attacks Continued, Nearly
           Hitting Someone on March 30, 2021.....................4

      3.   On May 7, 2021, After Yet Another BB Gun Attack,
           Defendant Was Arrested with Several BB Guns and a
           Real Firearm (Counts Two and Four)....................5

   C.   Defendant Has Repeatedly Expressed Animosity toward
        Planned Parenthood........................................6

   D.   After His Arrest, Defendant Attempted to Dispose of
        Multiple Firearms.........................................9

   E.   Defendant Possessed Thousands of Rounds of Ammunition
        at His Home..............................................10

   F.   Impact on Victims........................................11

III. GUIDELINES CALCULATION.......................................14

   A.   Count Two (18 U.S.C. § 248)..............................14

      1.   Base Offense Level: Attempted Aggravated Assault....14

      2.   Dangerous Weapon Enhancement........................17

      3.   Gender Motivation Enhancement.......................18

      4.   Obstruction.........................................19

   B.   Count Four (18 U.S.C. § 922(g)(1)).......................20

   C.   Multiple Count Adjustment................................20

   D.   Final Guidelines Range...................................20

IV.  A CUSTODIAL SENTENCE OF 48 MONTHS IS APPROPRIATE.............21

   A.   Nature and Circumstances of the Offense..................21

   B.   History and Characteristics of Defendant.................23

iii

    C.   Need for Deterrence and to Promote Respect for the Law...24

    D.   Restitution...............................................24

V.   CONCLUSION.....................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

McLaughlin v. United States,
   476 U.S. 16 (1986) .............................................. 20

United States v. Allen,
   341 F.3d 870 (9th Cir. 2003) ................................... 20

United States v. Donat,
   136 F. App'x 50 (9th Cir. 2005) ............................... 20

United States v. Garrett,
   3 F.3d 390 (11th Cir. 1993) ................................... 20

United States v. Gray,
   895 F.2d 1225 (8th Cir. 1990) ................................. 20

United States v. Ibarra,
   203 F.3d 833 (9th Cir. 1999) .................................. 19

United States v. Martinez-Jimenez,
   864 F.2d 664 (9th Cir. 1989) .................................. 20

United States v. McInnis,
   976 F.2d 1226 (9th Cir. 1992) ................................. 16

**Statutes**

18 U.S.C. § 113(a)(2)............................................. 17

18 U.S.C. § 245(b)(1)(E).......................................... 18, 19

18 U.S.C. § 248.................................................. 3, 16, 18

18 U.S.C. § 922(g)(1)........................................... passim

18 U.S.C. § 3553(a).............................................. 23, 26

Cal. Penal Code §§ 220, 245...................................... 17

**Rules**

USSG § 1B1.1..................................................... 19

USSG § 2A2.2................................................... 16, 19

USSG § 2H1.1(a)................................................ 16

USSG § 2K2.1(a)(6)............................................... 22

USSG § 2K2.1(b)(1)(B)............................................... 22

USSG § 3A1.1..................................................... 16, 20

USSG § 3C1.1..................................................... 16, 22

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Beginning in June 2020, defendant embarked on a systematic campaign to terrorize a Planned Parenthood women's healthcare clinic. As he has now publicly admitted, his goal was clear: intimidate the clinic and its doctors, staff, and patients from providing and obtaining reproductive health services, including the services related to the termination of a pregnancy.  This campaign only ended in May 2021 almost a year after it began when he again sprayed the clinic with a BB gun, this time with a loaded handgun in his front seat, and he was finally stopped and arrested by law enforcement. Defendant targeted this specific Planned Parenthood clinic on a dozen separate occasions, nearly striking a support companion on one occasion and resulting in lasting trauma to the staff and doctors who work there.  After his arrest, despite being a convicted felon, law enforcement recovered multiple firearms belonging to defendant, along with thousands of rounds of ammunition that he kept at his home, and documents referring to Planned Parenthood.

Defendant was indicted in February 2022 with three violations of 18 U.S.C. § 248(a) for forcible interference and attempted forcible interference with the obtaining and provision of reproductive health services (counts one, two and three), and two violations of 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm and ammunition (counts four and five).  In December 2022, defendant entered a plea of guilty pursuant to a written agreement with the government on count two and count four, one violation each of § 248(a) and § 922(g)(1).  (Dkt. 37.)

The Presentence Investigation Report ("PSR") calculated a Sentencing Guidelines total offense level of 22 and a criminal history category of I, with a resulting sentencing range of 41 to 51 months.  For the reasons set forth below, the government concurs with these Guidelines calculations and the recommended sentence of 48 months' imprisonment with three years of supervised release to follow, including stay-away conditions.  Defendant should also be ordered to pay restitution to the victims in an amount of $42,663.33.

**II.   FACTUAL BACKGROUND**

   **A.   Background on Planned Parenthood**

Planned Parenthood Pasadena and San Gabriel Valley ("Planned Parenthood") provides a wide range of health, wellness, and education services to the community, including vaccinations, preventative care, mammograms, pregnancy testing and counseling, as well as services relating to pregnancy or the termination of a pregnancy.  This particular clinic, which is located in Pasadena, California, is one of the busiest in the country, treating over 60,000 patient visits per year.  The building is well-marked from the street and has a bright red front door along with a sign facing the street advertising itself as "Planned Parenthood."  Parking is available in the rear, but patients enter through the front door.

Planned Parenthood is open to the public from Monday to Saturday with varying hours each day.  Staff, however, can be there well before and after the clinic is open to the public.  Same day and walk-in appointments have generally been available, even throughout the pandemic.  There is no noticeable change to the exterior when the building is open from when it is closed.

**B.   Defendant's Attacks on Planned Parenthood**

On multiple occasions in 2020 and 2021, defendant used his BB gun to terrorize the doctors, patients, and staff of Planned Parenthood.  His actions were designed to intimidate and interfere with the provision of reproductive health services, and he succeeded -- each attack left the clinic terrified of the next and disrupted their ability to provide critical medical care.  It took months before Planned Parenthood and the Pasadena Police Department ("Pasadena PD") were able to identify defendant as the shooter.

1.   Defendant's BB Gun Attacks against Planned Parenthood Began in June 2020

Beginning in June 2020, defendant drove his Chevrolet Malibu past the clinic and intentionally fired multiple pellets from a BB gun at the front door of the clinic.  (PSR ¶ 15.)  Defendant knew that the location was a Planned Parenthood, and he intentionally targeted the clinic because of his belief that its doctors and staff provided -- and its patients obtained -- reproductive health services, including services related to the termination of a pregnancy.  (Id.)  Defendant attacked the clinic approximately once a month in the beginning, on or about June 27, 2020, July 27, 2020, and August 12, 2020, respectively.  (Id.)  On all three occasions, defendant's BB gun spray damaged the clinic, shattered multiple windows, and intimidated the staff of the clinic.  (Id.)

On each occasion, Planned Parenthood staff contacted Pasadena PD to report the damage and provided surveillance footage from the August shooting depicting defendant's Malibu.  In response to these unpredictable shootings, Planned Parenthood's security specialist, Steven M., installed Plexiglas-style acrylic layers on the exterior

of its front-facing windows to protect employees, who never knew when the next attack would come.

Defendant has admitted these early attacks in his Plea Agreement.  (Plea Agreement ¶ 14.)

2.  Defendant's BB Gun Attacks Continued, Nearly Hitting Someone on March 30, 2021

Defendant has also admitted to committing two more shooting incidents around six months later.  (PSR ¶ 16; Plea Agreement ¶ 14.) On Monday, March 29, 2021, at 8:52 a.m., the manager of the clinic heard an object hit the window of her street-facing office.  The attack was frightening -- it caused her to fear for her physical safety and interfered with her ability to perform her job duties. (PSR ¶ 16.)  She later recounted to the FBI that she was opening her blinds at the time of the attack and believed she could have been seriously injured if a real weapon had been used rather than a BB gun, or if the windows had not been upgraded to Plexiglas.

The next day, on March 30, 2021, again while open and receiving patients, defendant shot at the front entrance of the clinic at around 8:30 a.m. while driving in his Malibu. (PSR ¶ 17.)  This time, the BB gun shots narrowly missed hitting a woman on the front porch bench.  (Id.)  The woman had come to the clinic to support a friend who was inside receiving services at the time of the assault. Defendant's pellets peppered the banners directly in front of the woman and landed in the building frame behind where she was seated. (Id.)  Photographs of the building illustrate that the bench is normally visible to those driving down the street.  Although the banner would have obscured the view of the bench from someone standing directly in front of the building, to defendant as he drove

1  in his car going southbound on Lake Avenue in the innermost lane,

2  both the bench and the woman would have been visible.

3      Defendant has admitted that he then committed several more BB

4  gun shooting incidents in rapid succession on April 9 (Friday at 9:04

5  a.m. while open), April 10 (Saturday at 8:53 a.m. while open), April

6  11 (Sunday at 8:56 a.m. while closed), April 15 (Thursday at 7:42

7  a.m. while closed), April 25 (Sunday at 8:50 a.m. while closed), and

8  May 2, 2021 (Sunday at 8:39 a.m. while closed).  (PSR ¶ 18; Plea

9  Agreement ¶ 14.)[1]

10          3.    On May 7, 2021, After Yet Another BB Gun Attack,
                 Defendant Was Arrested with Several BB Guns and a Real
11               Firearm (Counts Two and Four)

12      On May 7, 2021, just five days after the previous attack,

13  defendant again fired on the Planned Parenthood (count two) in order

14  to intimidate and interfere with the clinic, including its doctors,

15  patients, and staff, because of the reproductive health services

16  provided by the clinic.  (PSR ¶ 19; Plea Agreement ¶ 14.)  This time,

17  multiple units with the Pasadena PD responded, and defendant was

18  stopped in the Malibu just a short distance from the Planned

19  Parenthood.

20      In a Mirandized, recorded interview by Pasadena PD, defendant

21  denied shooting at the Planned Parenthood, and denied even knowing

22  where the clinic was located, claiming he was dropping off his

23  girlfriend's child at a foreign language school and then heading to a

24  friend's house to help him install a pool.  He did, however, inform

25  the officers that he was one of the "most hated people on the

26

27      [1] The footage from two of these prior occasions (April 11 and
    April 25, 2021, both Sundays) also depicted a female passenger inside
28  the car, sitting in the front passenger seat.  During his post-arrest
    interview, defendant said it was likely his 15-year-old daughter.

5

internet" because he had investigated Planned Parenthood in 2013. Defendant said that he was an undercover investigator for "Project Veritas" and that he was being targeted by Kamala Harris because of his investigation into Planned Parenthood.

Defendant also initially denied that there were any "real" guns in his car, only BB guns, but when confronted about the real firearm in the backpack at the police station, defendant whispered "oh fuck" and then admitted that he had it "for protection."  He also admitted he had a prior felony conviction.  Defendant accused Planned Parenthood of "taking whole babies and selling baby body parts," but still denied shooting at it with a BB gun.  After being told that he was seen on video shooting a BB gun at the building, defendant asked to see the video and added, after a brief silence, "at least the baby murderers have somebody on their side."

In total, the officers found the following in the Malibu:

- A gray backpack in the front passenger seat that contained a black Phoenix Arms .22 caliber pistol bearing serial number 4203784 in a plastic bag loaded with ten .22 caliber rounds of ammunition **(count four);**

- A brown pistol-style BB gun located under the driver seat loaded with metal pellets;

- Eight BB guns, including BB guns designed to look like assault rifles;

- Multiple pressurized gas canisters of $CO_2$ and BB pellets;

- Multiple packages of illegal fireworks.

(Plea Agreement ¶ 14.)

### C. Defendant Has Repeatedly Expressed Animosity toward Planned Parenthood

Defendant has admitted that he had an animus against the clinic and that he had previously gone "undercover" to "expose" the clinic

6

and its work related to the provision of reproductive health services, including services related to the termination of pregnancies.  (Plea Agreement ¶ 14.)

After he was released on bond following his arrest, on May 24, 2021, defendant was served a temporary protection order in person by a private investigator on behalf of Planned Parenthood.  (PSR ¶¶ 66-67.)  The order mandated for defendant to stay away from the Planned Parenthood location and four specific employees.  The private investigator also interviewed defendant after serving the legal documents.  Defendant explained to the private investigator that defendant has "irrefutable evidence" that Planned Parenthood engages in "illegal activity" and makes "$50,000 to $100,000 by selling body parts of aborted babies. . . . If possible, they do not dismember the body to be sold for parts but keep the baby alive to harvest the brain stem."  Defendant then mentioned that he was aware he may not get back the handgun the police seized from him, but he was less concerned about not getting that gun back than he would be if his other firearms were seized.  (Id.)

Defendant does not appear to have much of a presence on the internet or social media, but the FBI has located a 20-minute YouTube video posted on October 5, 2015, in which a person who appears to be defendant with the full name "Richard Chamberlin" in the caption makes statements to the camera.[2]  (PSR ¶¶ 68-69.)  Defendant introduces himself as an "investigative journalist and documentary film maker," and provides a laundry list of complaints about "the system."  He urges people "to stand up and fight this," including by

---

[2] There are multiple other videos on this same channel depicting defendant's name, voice, and face.

posting videos like his own and thanks "Alex Jones and Inforwars" and how "watching him has totally changed my world."  He then says, "Wake up America, it's time to stop aborting babies and selling their body parts.  It's time to change this place.  I'm all for pro-choice.  Pro-choice for the baby.  He gets to choose who his parents are, not who is body parts purchasers are.  It's disgusting.  This country has become a disgusting Nazi replica.  And it's time for us to make the call."  He ends by saying he has another video on his series prompted by the "whole Planned Parenthood videos."  (Id.)

During his federal interview, which was also <u>Mirandized</u>,[3] defendant restated that he worked with people who were investigating Planned Parenthood and made a number of statements about his disgust over Planned Parenthood's business model of selling baby organs for profit.  (PSR ¶¶ 33-34.)  He claimed not to remember the BB gun shootings and made oblique admissions, like "maybe I did, I had dreams about shooting the bb gun."  (<u>Id.</u>)  When he was told that he interfered with the clinic because the BB guns prevented doctors from coming in, he said "so I just stopped a doctor that kills 3 or 400 babies a year, and I'm supposed to feel sorry for him?"  (<u>Id.</u>)  Eventually he said he'd be willing to apologize to the victims and tell them "I'm sorry that you were terrorized by the situation," and "you've got the evidence that says I did it, so if I did it, I'd be sorry for it and I wouldn't do it again.  Wish I weren't taking those pills."  (<u>Id.</u>)

---

[3] Defendant said, "I would rather have my lawyer present," at which point the agents terminated the interview out of an abundance of caution.  Defendant then re-initiated the interview, was re-<u>Mirandized</u>, and signed a written waiver of rights.

### D.  After His Arrest, Defendant Attempted to Dispose of Multiple Firearms

Defendant has also admitted that after his May 2021 arrest, he attempted to dispose of eight of his firearms.  (Plea Agreement ¶ 14.)  Planned Parenthood's restraining order prohibited defendant from possessing and/or purchasing a firearm, which is also prohibited by his status as a convicted felon, and the order also stated that he must surrender, sell, or store any firearms with a licensed gun dealer and show proof of these actions in court.

At the time of his arrest, defendant had a total of nine firearms registered to him in California, all of which were acquired before his conviction, including six semi-automatic pistols, one shotgun, a bolt-action rifle, and a semi-automatic rifle.[4]  On June 3, 2021, in response to this restraining order, defendant surrendered only four of these firearms to Lock Stock and Barrel Investments Incorporated.  (PSR ¶ 30.)  However, after news of defendant's arrest received some publicity, a former neighbor of defendant's contacted law enforcement to report that defendant had asked him to store several of his firearms.

The neighbor said that defendant had reached out after being stopped by the Pasadena PD to say he was dealing with some "bullshit" and made no mention of the fact that he had been shooting at a Planned Parenthood or was a convicted felon.  Instead, defendant explained that he was stopped with a gun in his car, and his lawyer advised him to sell or get rid of all of his real guns.  Defendant

---

[4] Missing from this registration list was the Phoenix Arms, .22 caliber handgun he possessed on May 7, 2021, which he purchased in Utah prior to his conviction but did not register in California upon bringing it into this state.

has admitted that he gave this neighbor eight of his firearms.  (Plea Agreement ¶ 14.)  The neighbor recalled defendant asking him to hold onto these weapons for him.  The neighbor also recalled that defendant began espousing conspiracy theories and anti-abortion language a few years back and that defendant believed people who participated in abortions were baby killers and were selling baby parts.  As soon as the neighbor learned about the federal charges and that defendant was a convicted felon, he immediately called the police and wanted nothing to do with the firearms or defendant.

In his interview with the FBI, defendant stated that his additional guns were in storage in a box at his recently deceased mother's house and would be part of her probate proceedings.  He made no mention of the guns he asked his neighbor to stash for him after his arrest.  It remains unknown if defendant has additional firearms elsewhere, and if so, where.  Four of the eight firearms registered to him in California remain unaccounted for, and as evidenced by the gun he possessed in May 2021 and several of the ones turned in by his neighbor, defendant possessed an untold number of unregistered firearms at the time of his arrest.

### E.   Defendant Possessed Thousands of Rounds of Ammunition at His Home

Defendant has also admitted to knowingly possessing thousands of rounds of ammunition at his home.  (Plea Agreement ¶ 14; PSR 24.)  Law enforcement arrested defendant on the federal charges in January 2022 outside the Pasadena Courthouse after one of his state appearances and executed search warrants on his person, the Malibu, the residence he shares with his girlfriend in Altadena, California, and another residence he recently acquired in Ontario, California.

10

In his home in Ontario, defendant had thousands of rounds of ammunition.  Law enforcement has counted at least 5,960 rounds of ammunition, as well as boxes of fireworks, canisters of gun powder, a dozen additional BB guns and ammunition for BB guns, including rifle-style airsoft guns, multiple magazines for real handguns, a black cylinder resembling a suppressor, a P80 Polymer 80 gun-making kit and multiple gun parts, including a gun stock and the barrel for a .22 caliber pistol, as well as multiple documents identifying and referring to Planned Parenthood.  (PSR ¶ 24.)

Below are pictures of the ten ammunition boxes found at his residence, each of which contained hundreds of rounds of ammunition:



## F.   Impact on Victims

Defendant's conduct has had a lasting impact on the clinic and its staff.  (PSR ¶¶ 27-29.)  "I will forever carry the terror inflicted by the defendant on me," were the words Cheri P., the Vice President of Patient Services at Planned Parenthood used to describe

1  the impact the attacks had on her.  (Lewis Decl., Ex. 1 at 1.)  Three

2  current and former employees of Planned Parenthood have provided

3  written victim impact statements to the Court (id. at Ex. 1, 2, 3),

4  and the government anticipates oral statements by additional victims

5  at the sentencing hearing in this case.

6       These victims have all been deeply impacted by defendant's

7  conduct.  The clinic's employees still experience daily anxiety and

8  fear, and they have an overwhelming sense of being unsafe in their

9  work environment.  (PSR ¶ 28.)  Even though Chamberlin shot a BB gun,

10  the knowledge that he possessed multiple guns and ammunition, along

11  with a loaded weapon in his car during the final attack, has further

12  traumatized them.  (Id.)  They believe an individual with this type

13  of ideology would inevitably escalate the situation from using a BB

14  gun to a firearm with ammunition.  (Id.)  Cheri P. further described

15  how "powerless" the attacks made her feel and that she and her staff

16  "did not feel safe at work."  (Lewis Decl., Ex. 1 at 1.)

17       Defendant's conducted inflicted more than just emotional trauma

18  on his victims -- the shootings had a real impact on the clinic's

19  ability to treat patients.  "Each time he shot at us, I had to pause

20  what I was working on -- helping to run health centers that provide

21  critical sexual and reproductive health care services -- to deal with

22  the consequences of his actions."  (Id.)  Employees called in sick or

23  left early because of their fear, and some staff resigned because

24  "they did not feel safe."  (Id.)

25       One of those employees who felt so unsafe after defendant's

26  attacks that she had to resign was Nurse D., who worked at the clinic

27  as a certified nurse midwife during the attacks.  (Lewis Decl., Ex. 2

28  at 1.)  Nurse D. was there during one of defendant's shootings on a

day she was scheduled to provide abortions.  Her days were already "stressful and intense," but when she learned what had happened that day, she "was shocked" and "felt deeply unsettled."  (Id.)  Going forward, "every knock at the door, rattling noise, or startling sound worried me. . . . I was worried about whether I would make it home each night to my family.  No one should have to feel that way for doing their job."  (Id.)  Her fears for her safety led to her resignation in 2021.  (Id.)

In response to these sustained and random attacks, Planned Parenthood had to undergo repairs and upgrades to the building, including its locks and security cameras.  (Lewis Decl., Ex. 3 at 1.) Steven M., the security and facilities manager worked tirelessly with law enforcement to identify defendant and to minimize the damage that could be caused from defendant's unpredictable and traumatic shootings.  (Id.)  "Every day that went by, I feared for our staff and patients, and worried that someone would get hurt on my watch." (Id.)  He spent multiple mornings just watching and waiting, feeling "helpless" that defendant "was still out there."  (Id.)  When he learned that defendant had been arrested, he felt relief, only to feel the immediate agony of knowing that defendant had in his possession multiple guns and ammunition.  (Id. at 2.)  "When I read that, my heart dropped."  (Id.)  "I constantly fear that defendant will attack us again, and that the next time he does, he'll do something worse."

All of these victims have asked the Court to impose a significant custodial term in this case, and to make sure that "once he gets out, he can't come near a Planned Parenthood health center or other abortion provider."  (Id. at 2.)

13

1  **III. GUIDELINES CALCULATION**

2      **A.   Count Two (18 U.S.C. § 248)**

3      The parties have no agreement as to the Guidelines calculation

4  for count two.  (Plea Agreement ¶ 16.)  The United States calculates

5  the Guidelines for count two as follows, which is the same as in the

6  PSR (PSR ¶¶ 38-48):

| Base Offense Level | 14 | USSG §§ 2H1.1, 2A2.2 |
|---|---|---|
| Dangerous weapon | +4 | USSG § 2A2.2(b)(2) |
| Gender motivation | +3 | USSG § 3A1.1 |
| Obstruction | +2 | USSG § 3C1.1 |
| **Ct. 2 Total Offense Level** | **23** | |

    1.   Base Offense Level: Attempted Aggravated Assault

    The base offense level for a violation of 18 U.S.C. § 248(a)(1)
is set forth in USSG § 2H1.1(a).  Here, because defendant's
underlying conduct amounts to attempted aggravated assault with a
dangerous weapon, then under § 2H1.1(a)(1), the base offense level is
14 under USSG § 2A2.2(a) with an additional four-level enhancement
for use of a dangerous weapon under § 2A2.2(b)(2).  See USSG
2H1.1(a), App. N. 1 (defining the imported offense level as including
the base offense level and specific offense characteristics from the
Chapter Two Guidelines).  The applicable "underlying offense" need
not have been charged and can include "any conduct established by the
offense of conviction that constitutes an offense under federal,
state, or local law."  Id.; see also United States v. McInnis, 976
F.2d 1226, 1233 (9th Cir. 1992) ("[C]onsideration of a defendant's
underlying offense [under § 2H1.1] does not require that the
defendant actually have been convicted of or charged with any other

14

crime.  Rather, the sentencing court is to determine the offense
level of the offense most comparable to the defendant's conduct.").

For an attempted offense, the Guidelines apply the base offense
level for the underlying substantive offense.  See USSG § 2X1.1.
Here, the most applicable underlying substantive offense is
aggravated assault, which is defined, in relevant part, as a
felonious assault that involved (A) a dangerous weapon with intent to
cause bodily injury (i.e., not merely to frighten) with that weapon,
or (D) intent to commit another felony.[5]  Here, there is ample
evidence that defendant used a dangerous weapon with intent to
inflict bodily injury or to commit another felony, and thus his
conduct constituted attempted aggravated assault.

> a.  Use of Dangerous Weapon with Intent to Commit
>     Bodily Injury

On every occasion, defendant used a BB gun to attack the Planned
Parenthood.  As explained below, a BB gun is a dangerous weapon.
There is also evidence of his intent to commit bodily injury.  (PSR
¶ 41.)  During each of defendant's attacks on Planned Parenthood, he
aimed his weapon at the doors and windows of the facility where
individuals would most likely be present, as opposed to, for example,
aiming at the sign in the yard out front of the building.  The
majority of the attacks also occurred during business hours when the
facility would have been open and receiving patients through the
front door where defendant was aiming.

During his March 31, 2020, attack, there was a woman seated on

_____

[5] Assault with a deadly weapon and assault with intent to commit
another felony are both themselves considered felonies under
California law.  See, e.g., Cal. Penal Code §§ 220, 245.  Federal law
similarly penalizes such conduct as felonies.  See, e.g., 18 U.S.C.
§ 113(a)(2), (3).

the bench outside the facility.  Although there were banners in front of the porch, those banners would not have obstructed defendant's view of the woman as he was driving south down Lake Avenue.  The attacks also increased with greater frequency following the March 30, 2021, attack where he missed his intended target.  During the attack on May 7, 2020, which is the offense of conviction, defendant similarly aimed for that front door where he would have expected patients or staff to be present.  Defendant has admitted that during this attack he "used force and the threat of force to intentionally intimidate and interfere with the clinic and its doctors, staff, and patients" because of the services the clinic was providing.  It is clear from his actions that he fired his BB gun intending to cause bodily injury.

> ### b.   Intent to Commit Another Felony

Defendant also fired his BB gun intending to commit another felony.  Although the charged offense is a misdemeanor violation of 18 U.S.C. § 248(a)(1), there is sufficient evidence that defendant intended to violate 18 U.S.C. § 245(b)(1)(E) (interference with federally funded programs) when he attacked the Planned Parenthood, which is a felony.

This particular statute penalizes those who "by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with: (1) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from; (E) participating in or enjoying the benefits of any program or activity receiving Federal financial assistance."  18 U.S.C. § 245(b)(1)(E).  This crime is a felony and punishable by up to 10 years' imprisonment if the crime

16

involved the "use, attempted use, or threatened use of a dangerous weapon."  Id.

Here, there is no doubt that defendant intended to intimidate or interfere with the patients and staff of Planned Parenthood because he has admitted as such in his plea agreement. (Plea Agreement ¶ 14.) Thus, the only question is whether those individuals were "participating in or enjoying the benefits of any program or activity receiving Federal financial assistance."  The vast majority of Planned Parenthood's billing for services goes through California Medi-Cal to federal Medicaid and California's federally funded Medicaid program is the most common form of insurance they use.  They also receive federal funds through grants for foster youth services and for contraception programs.  Thus, because defendant intended to interfere with the operations of Planned Parenthood, and Planned Parenthood is a "program or activity receiving Federal Funds," the higher base offense level for attempted aggravated assault applies for this second reason as well.

2.   Dangerous Weapon Enhancement

Under § 2A2.2(b)(2), a four-level enhancement applies if defendant used a dangerous weapon during the commission of the offense.  A dangerous weapon is defined as "an instrument capable of inflicting death or serious bodily injury."  See USSG 2A2.2, App. N. 1 (citing USSG § 1B1.1, App. N. 1(e)).  Application Note 1(H), the definition of "firearm," further clarifies that "[a] weapon, commonly known as a 'BB' or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm."  See also United States v. Ibarra, 203 F.3d 833, 1 (9th Cir. 1999) (holding that a BB gun was a "dangerous weapon" for a

1 different Guidelines provision); <u>United States v. Donat</u>, 136 F. App'x
2 50, 52 (9th Cir. 2005) (holding that a stun gun, BB gun, and duct
3 tape were all "dangerous weapons" for a different statute); <u>United
4 States v. Gray</u>, 895 F.2d 1225 (8th Cir. 1990) (holding that an
5 unloaded BB gun was a dangerous weapon in bank robbery Guidelines).

6     Even toy guns or inoperable guns can be dangerous weapons.  <u>See
7 McLaughlin v. United States</u>, 476 U.S. 16, 17-18 (1986) (holding an
8 unloaded gun was a dangerous weapon when used in a bank robbery
9 because even a toy gun would be a dangerous weapon if used in a
10 threatening way or as a bludgeon); <u>United States v. Martinez-Jimenez</u>,
11 864 F.2d 664, 667 (9th Cir. 1989) (holding that a toy gun "creates
12 some of the same risks as those created by one who carries an
13 unloaded or inoperable genuine gun."); <u>United States v. Garrett</u>, 3
14 F.3d 390 (11th Cir. 1993) (holding that toy guns, including a BB gun,
15 were dangerous weapons); <u>see also</u> <u>United States v. Allen</u>, 341 F.3d
16 870 (9th Cir. 2003) (noting how broomsticks were one of the weapons
17 classified as dangerous weapons because of how they could be used).

18         3.  <u>Gender Motivation Enhancement</u>

19     Under § 3A1.1, a three-level enhancement applies if the evidence
20 shows beyond a reasonable doubt that defendant selected "<u>any</u> victim"
21 because of their actual or perceived gender or gender identity.
22 Alternatively, a two-level enhancement applies if defendant knew or
23 should have known that a victim was vulnerable.  USSG § 3A1.1(a),
24 (b).  Here, both apply, which means that only the gender-enhancement
25 should apply.  App. N. 3.  Defendant admitted in his plea agreement
26 that he targeted not just the doctors and staff of the Planned
27 Parenthood, but also the "patients" of Planned Parenthood.  (Plea
28 Agreement ¶ 14.)  The evidence also proves beyond a reasonable doubt

18

that he targeted these patients because of his specific animosity against abortions.  The only patients of Planned Parenthood that receive abortions are women; therefore, by targeting female patients, defendant without a doubt selected these victims because of their gender even if he also targeted other victims for other reasons.

### 4.   Obstruction

Under § 3C1.1, a two-level enhancement applies because the defendant undertook efforts to willfully obstruct and impede the investigation.  Defendant admitted in his plea agreement that after his arrest on May 7, 2021, he "attempted to dispose of his remaining firearms."  (Plea Agreement ¶ 14.)  Four of them he attempted to dispose of lawfully by surrendering them and creating a record of this surrender as part of the temporary restraining order proceedings, but then he transferred eight to a neighbor where they would go undetected.  Defendant did not explain to the neighbor that a Court ordered him to surrender his guns or that he was a convicted felon.  When the neighbor asked a few months later about the guns, defendant said the charges had been dropped, even though the state case remained pending.  He then separately lied to the FBI and told them that his firearms were at a storage location belonging to his deceased mother.  These actions amounted to concealing material evidence after he had been arrested for possessing a firearm, and thus the enhancement applies.[6]

---

[6] The United States considered but ultimately does not seek a two-level enhancement for using a minor to commit a crime under § 3B1.1 for defendant's inclusion of his 15-year-old daughter in his attacks on at least two occasions.  See FBI Interview Recording, USAO_000025 at around 3:30 ("that was probably my daughter and she's 15.")

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.    Count Four (18 U.S.C. § 922(g)(1))**

As set forth in the Plea Agreement (¶ 16), the parties have agreed to a base offense level and a number-of-firearms enhancement for Count Four, as noted in bold below.  Additionally, both parties are free to seek any other specific offense characteristics, adjustments, or departures.  (Id.)  The United States calculates the Guidelines on Count Four as follows, which is the same as in the PSR (PSR ¶¶ 49-57):

| Base Offense Level | 14 | USSG § 2K2.1(a)(6) |
|---|---|---|
| Number of Firearms | +4 | USSG § 2K2.1(b)(1)(B) |
| Obstruction | +2 | USSG § 3C1.1 |
| **Ct. 4 Total Offense Level** | **20** | |

The explanation for the obstruction enhancement is the same as described above.

**C.    Multiple Count Adjustment**

The offenses in Count Two and Count Four do not group because the act of firing a BB gun at the clinic is distinct from the crime of possessing a firearm as a prohibited person, and neither is a specific offense characteristic of the other.  (PSR ¶¶ 58-60; USSG § 3D1.2.)  With a total offense level of 23 for Count Two and a total offense level of 20 for Count Four, there are thus two equally serious units, resulting in an additional two-level enhancement. USSG § 3D1.4.  This brings defendant's total offense level to 25.

**D.    Final Guidelines Range**

The PSR determined that defendant falls within criminal history category I.  After applying a two-point downward adjustment for

acceptance of responsibility under § 3E1.1(a) and a one-point

downward adjustment under § 3E1.1(b), defendant's total offense level

is 22.  Defendant's Guidelines range is therefore 41-51 months.

**IV.  A CUSTODIAL SENTENCE OF 48 MONTHS IS APPROPRIATE**

A 48-month custodial sentence appropriately balances the

mitigating and aggravating factors under 18 U.S.C. § 3553(a) in this

case.  The seriousness of the offense, the specific history and

characteristics of this defendant, the need for just punishment, the

need for specific and general deterrence, and the need to protect the

community all compel the requested custodial sentence of 48 months.

**A.  Nature and Circumstances of the Offense**

The aggravating factors in this case necessitate the imposition

of a lengthy custodial sentence, which here is 48 months.  Defendant

has admitted that on at least 11 occasions between June 2020 and May

2021, he used force and the threat of force to intentionally

intimidate and interfered with the Planned Parenthood clinic and its

doctors, staff, and patients.  (Plea Agreement ¶ 14.)  He acted

"because the clinic was and had been providing, and because such

patients were and had been obtaining, reproductive health services"

and that he "sought to intimidate the clinic and its doctors, staff,

and patients from providing and obtaining reproductive health

services."  (Id.)

Although fortunately no one was physically injured by

defendant's conduct, this was the result of his chosen method of

attack -- cowardly firing a BB gun through the window of his getaway

car to ensure an easy escape and conceal his identity -- rather than

a lack of intent.  His spray was aimed at the doors and windows of

clinic, frequently on days and mornings when it would have been open

1    and receiving patients through that door.  It was through sheer luck

2    that the BB pellets defendant fired at the front door in March 2021

3    missed their intended target and landed around the patient support

4    companion, instead of in her.  Or that his attack that struck the

5    manager's window hit recently upgraded Plexiglass and did not shatter

6    glass into her office and onto her person where she was sitting.

7          To this day, the clinic is suffering the consequences of

8    defendant's indefensible conduct.  Employees have quit, or called in

9    sick, or otherwise not been able to focus their undivided attention

10   on serving their patients.  For more than just the year that

11   defendant engaged in these attacks, for well after, employees lived

12   in fear of the next attack, never knowing and always wondering when

13   the shootings might escalate beyond BB guns and into real guns.

14   Patients received less care on days that the clinic had to close or

15   stop providing services to respond to defendant's violent actions.

16         Defendant's conduct against the Planned Parenthood clinic also

17   cannot be viewed in isolation from his decision to bring a loaded

18   firearm with him that final day.  Defendant was a convicted felon and

19   knew he was a convicted felon, yet be possessed this gun and many

20   more before he was caught.  (Plea Agreement ¶ 14.)  He also possessed

21   thousands of rounds of ammunition at his home, which were so

22   voluminous that even after counting over 5,000 rounds, thousands more

23   remain uncounted.  He also tried to conceal his weapons cache from

24   law enforcement after he was caught.  Defendant surrendered four

25   firearms after he was ordered to do so, but then actively took

26   efforts to conceal the whereabouts of eight more firearms, all of

27   which he was illegally possessing given that he knew he was a

28   convicted felon.  But for the publicity about this case, the

whereabouts of those firearms would likely remain unknown, and the whereabouts of the four more firearms registered to him in California (and an untold number of unregistered firearms) remains unknown.

**B.   History and Characteristics of Defendant**

Defendant has demonstrated deep-seeded beliefs in dangerous conspiracy theories that resulted in the accumulation of a massive tranche of weapons and ammunition, even though as a convicted felon he was prohibited from owning any of these items.  He then repeatedly assaulted a women's health care clinic because of his hatred of a very small portion of the clinic's medical services to underprivileged communities, interfering with their ability to treat their patients.  His conduct spanned nearly a year of terror and a dozen different occasions, reflecting thought and intentionality behind his conduct, not actions taken out of the heat of anger.

Although he has now accepted responsibility in the federal case, defendant showed no signs of stopping his violent and aggressive behavior until he was arrested.  Even after his arrest by Pasadena PD in May 2021, he did not show remorse for his conduct.  He told the police, "at least the baby murderers have somebody on their side," and at one point even showed pride in what he had achieved: "so I just stopped a doctor that kills 3 or 400 babies a year, and I'm supposed to feel sorry for him?"

In mitigation, defendant has had no criminal history between his 2011 criminal conviction and the conduct in the instant case.  He has also spared the victims the emotional agony of a trial by accepting responsibility and pleading guilty promptly in this case.  These considerations are reflected in the government's recommendation of a sentence at the mid-point of his Guidelines range and do not outweigh

the serious aggravating circumstances that support the imposition of a Guidelines sentence in this case.

### C.   Need for Deterrence and to Promote Respect for the Law

Defendant's conduct reflects a dangerous individual engaged in an escalating pattern of violence that must be deterred from taking similar action in the future, and from taking even more violent action in the future.  There is also a substantial need to deter the general public from targeting a women's health clinic based on a distorted view of the services it provides.  The government's recommended sentence will give defendant sufficient time to reconsider his actions in light of their substantial consequences. And a maximum term of three years of supervised release with conditions preventing him from going near Planned Parenthood or other abortion providers would help hold defendant accountable for his future actions and deter him from committing future crimes.

### D.   Restitution

As part of his plea agreement, defendant agreed to pay restitution in an amount of $42,663.33, which represents the cost to Planned Parenthood to repair and respond to the damage he caused during his BB gun shootings.

## V.   CONCLUSION

For the foregoing reasons, a sentence of 48 months' imprisonment to be followed by a three-year term of supervised release, would be sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).  The government respectfully requests that the Court sentence defendant accordingly and order restitution in an amount of $42,663.33.